UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CORNELL DRAPES (#N-10531), | ) |
| Plaintiff, | ) |
| v. | ) No. 14 C 9850 |
| MARCUS HARDY, *et al.*, | ) Judge Rebecca R. Pallmeyer |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Cornell Drapes, currently incarcerated at Stateville Correctional Center ("Stateville"), brought this pro se civil rights action pursuant to 42 U.S.C. § 1983. He alleges that Defendant Marcus Hardy, the former warden of Stateville, acted with deliberate indifference to Drapes' serious medical needs in violation of the Eighth and Fourteenth Amendments to the United States Constitution. Specifically, Drapes alleges that Hardy and his subordinates failed for three months to respond to Drapes' requests to treat a pre-cancerous growth on his vocal cords, resulting in permanent damage to Drapes' throat. Hardy now moves for summary judgment. For the reasons stated here, the motion is granted.

## BACKGROUND

### I. Statement of Facts

Plaintiff Cornell Drapes, born May 1, 1961, has been incarcerated in the Illinois Department of Corrections (the "IDOC") since December 2007. (Drapes Dec. at 15, Ex. C to Def.'s 56.1 [117].) Drapes was initially housed in the Menard Correctional Center (the "MCC") where, in 2009, a physician diagnosed polyps on his vocal cords. (*Id.* at 16; Def.'s 56.1 ¶ 5.) That same year, a doctor at St. Anthony's Hospital told Plaintiff that he did not suffer from polyps. (*Id.*) Drapes' prison medical records, dated June 2, 2012, nevertheless reflect that he suffered from

polyps on his vocal cords, gastroesophageal reflux disease ("GERD"), and chronic laryngitis. (*Id.* ¶ 6.)

In June 2012, Drapes was transferred to Stateville. At the time, Stateville's warden was Marcus Hardy. (*Id.* ¶ 2.) Hardy considered it his "obligation as Warden . . . to ensure that the medical professionals are providing access to medical care to the offender population." (Hardy Decl. ¶ 8, Ex. B to Def.'s 56.1.) His knowledge of the day-to-day operation of medical care was limited, however. Hardy did not participate in scheduling medical appointments to the Health Care Unit (the "HCU") and was never provided "sick call" slips by Stateville's medical staff. (Def.'s 56.1 ¶ 7.) Nor was Hardy ever informed if an offender missed a medical appointment. (*Id.* ¶ 9.)

Drapes arrived at Stateville's Northern Receiving and Classification Center (the "NRC") on June 2, 2012. (*Id.* ¶ 10.) He received a mandatory medical screening upon arrival. (*Id.* ¶ 11.) During the examination, Drapes informed the screening nurses that he had recently undergone surgery for removal and biopsy of a pre-cancerous growth on his vocal cords, and insisted that he needed to be scheduled for a follow-up appointment. (*Id.* ¶ 11.)

On June 8, 2012, Drapes was transferred from the NRC to the main prison. (*Id.* ¶ 12.) Intake staff noted Drapes' throat conditions and placed him on "sick call." (*Id.*) Additionally, a member of the medical staff told Drapes that a doctor would see him within one to two weeks. (*Id.*) Drapes was then scheduled to be seen in the HCU on June 18, 2012.[1] (*Id.* ¶ 16.)

Before the day of the HCU appointment, however, Stateville went on lockdown for a month.[2] (*Id.* ¶ 16.) Lockdowns are declared "when there is a major situation involving an incident

---

[1] The court notes that, according to Drapes, when a prisoner is called to the HCU on a medical pass, doctors invariably permit him to speak only about the medical issue that is the subject of the pass. (Drapes Aff. [122] ¶ 12.) For example, "if an offender registers at sick call for a cold, he is not allowed to complain of throat pain." (*Id.*) This allegation does not appear relevant to Drapes' case, however. When Drapes was first seen in the HCU, in December the attending doctor did address Drapes' throat issue. (Def.'s 56.1 ¶ 32.)

[2] Neither the exact dates of this lockdown, nor the reason for it, are in the record.

at the facility which requires investigation, or occasionally when there is a statewide lockdown declared by IDOC's central offices." (*Id.* ¶ 14.) During a lockdown, inmates are not permitted to move from their cells, and thus medical appointments are automatically cancelled. (*Id.* ¶¶ 14-15.) According to Hardy, "[a]ppointments emergent in nature are evaluated on a case by case basis and seen as medical staff direct." (Hardy Decl. ¶ 15.) However, neither the frequency with such exceptions are made, nor the extent which Hardy is involved, are stated in the record. As a consequence of the June 2012 lockdown, Drapes' June 18, 2012 HCU appointment was cancelled. (Def.'s 56.1 ¶¶ 16-17.)

On July 21, 2012, a correctional medical technician (a "CMT") examined Drapes in his housing unit. (Def.'s 56.1 ¶ 19; Drapes Dep. at 82.) Although the CMT noted that Drapes "complained about his throat condition," the record does not reflect that the CMT took any action to evaluate or treat the condition. (Def.'s 56.1 ¶ 19.) During the meeting, Drapes mentioned that he was not receiving prescribed medication, and the CMT noted that there were no current copies of prescriptions in Drapes' chart. (*Id.*)

About a month later, on August 20, 2012, Drapes spoke to a physician's assistant (a "PA") in the medical area of his housing unit. (*Id.* ¶ 20; Drapes Dep. at 31.) There is no evidence that the PA examined Drapes' throat during this meeting. The PA did note that Drapes' medical records from the MCC were missing from his prison chart, and also prescribed Protonix to treat Drapes' GERD condition, as well as Motrin, an NSAID painkiller. (Def.'s 56.1 ¶ 21.) The medical record documenting the examination additionally reflects that the PA referred Drapes to see Stateville's medical director, although it is unclear what effect this referral had. (*Id.*) The same record states that over three weeks later, on September 12, 2012, another member of the medical staff referred Drapes to the medical director. (Medical Records at IDOC-MED000016, Ex. C to Def.'s 56.1.) Drapes would not end up seeing the medical director, Dr. Obaisi, until December. (Def.'s 56.1 ¶ 32.)

On or about late September 2012, Drapes recalls speaking to the warden, Marcus Hardy, about his throat condition. (Def.'s 56.1 ¶ 23; Drapes Dep. at 123.) This conversation took place at Drapes' cell. (*Id.*) Drapes detailed the nature of his throat issues, and relayed to Hardy that his condition had not been adequately attended to. (Drapes Dep. at 118-19.) Hardy responded, in substance, that if Drapes would write out a description of his medical issue, Hardy would ensure that Drapes was seen by a doctor. (*Id.* at 119.) This is the only conversation Drapes recalls having with Hardy about his throat condition. (Def.'s 56.1 ¶ 25.) Hardy does not recall ever speaking with Drapes, and states that he is not familiar with Drapes. (*Id.* ¶¶ 26-27.)

Thereafter, Drapes was scheduled for an October 1, 2012 appointment at the HCU. (*Id.* ¶ 28.) Drapes insists that he was never given a pass permitting him to visit the HCU on this day, however, nor was he informed that he had an appointment scheduled. (Drapes Dep. at 86-87.) Drapes did not attend the HCU on that date. (Def.'s 56.1 ¶ 28.)

On October 1, 2012, Drapes wrote the following letter, which he sent to Hardy:

> I wrote you a Grievance about my denial of medical treatment follow-up, which was then not an emergency. I refiled the Grievance and also talked with you in person about my problem. You took my name and said you would get me to the Health Care Unit. At the time of this, I had not yet gone. I don't know what other steps to take at this time.

(Drapes Dep. at 122.) Hardy does not recall reading this letter. (Def.'s 56.1 ¶ 30.) Although Hardy acknowledges that he would sometimes personally open and read his mail, he avers that such occasions were "on a random basis at my request." (Hardy Decl. ¶ 30.) On all other occasions, Hardy asserts, his mail was reviewed by clerks in his office, who would forward letters on to other departments without Hardy's knowledge or input. (*Id.*) Hardy believes it is likely that a clerk forwarded Drapes' letter to the HCU, although the court is not aware of any evidence that this was done. (*Id.*)

Later in October, Drapes filed an "emergency" grievance. (Def's 56.1 ¶ 51.) On October 26, 2012, this grievance was reviewed by Kevin Sonor, who Hardy describes as "a designee who reported to me." (Hardy Decl. ¶ 23.) Ultimately, the grievance was rejected as "not

4

constituting an emergency." (Def.'s 56.1 ¶ 52.) Although the document itself is not in the record, both parties agree that it was signed by Senor and not Hardy. (*Id.*) Drapes contends that Senor "signed his initials, but signed Hardy's name," which the court interprets to mean the signature line asked for Hardy's signature. (Pl.'s 56.1 Resp. [122] ¶ 52.) Hardy has no memory or knowledge of the grievance. (Def.'s 56.1 ¶¶ 50, 53.)

In December 2012, Drapes filed yet another grievance concerning his medical treatment. (*Id.* ¶ 51.) Hardy asserts that this grievance was not designated as critical in nature, and therefore did not go to the warden's office. (*Id.* ¶ 51.) Instead, Hardy contends, "Plaintiff's counselor" responded to this grievance, although he does not explain who this counselor is, or what the response entailed. (*Id.*) Drapes disputes that his grievance failed to reach the warden's office, and states that "all grievances have to be signed by the Warden once the grievance officer either denys[sic] or approves a grievance." (Pl.'s 56.1 Resp. ¶ 54.)

Sometime in December 2012, Drapes spoke with the facility's medical director, Dr. Obaisi, in the HCU. (Def.'s 56.1 ¶ 32.) Drapes claims to have asked Dr. Obaisi to examine him and then, if necessary, refer him to a doctor who could treat his throat condition. (Pl.'s Resp. Def.'s 56.1 ¶ 33.) Dr. Obaisi did not examine Drape, but did refer him to an outside ear, nose, and throat specialist (an "ENT"). (*Id.* ¶ 34, 35.) Approximately one month later, Drapes consulted with an outside ENT (*Id.* ¶ 37.) Thereafter, Drapes attended "an unknown number" of appointments with the ENT and related outside providers. (*Id.* ¶ 38.) In 2013, he underwent multiple throat surgeries to remove growths from his vocal cords. (*Id.*)

Hardy asserts that he has not worked in any capacity at Stateville since December 31, 2012. (Def.'s 56.1 ¶ 2.) Drapes alleges, to the contrary, that "Hardy is acting as a[sic] assistant Director at Stateville." (Pl.'s Resp. Def.'s 56.1 ¶ 2.) The court takes judicial notice that, according to the official Illinois Department of Corrections website, Hardy was warden of Sheridan Correctional Center from January 2013 until 2014, at which point he was named deputy director of the Central District for IDOC. *Executive Assistant to the Director*, ILLINOIS DEPARTMENT OF

CORRECTIONS, https://www2.illinois.gov/idoc/aboutus/Pages/ExecutiveChief.aspx (last visited Mar. 27, 2019). Those records show Hardy has not returned to Stateville since 2012, and currently serves as executive assistant to the director of the IDOC. (*Id.*)

Plaintiff appealed the denial of his December 2012 grievance, but it was not reviewed by a grievance officer until February 2013. (*Id.* ¶ 55.) By this point, Hardy was no longer serving as the warden of Stateville. Hardy has no memory of reviewing any grievances from Plaintiff, and does not believe he had any further contact or communication with Plaintiff about his medical care. (*Id.* ¶¶ 50, 56.)

Between June 2012 and December 2012, Plaintiff's symptoms included "slight pain" and "soreness" in his throat. (Def.'s 56.1 ¶ 40.) Plaintiff was able to eat and exercise during this time period. (*Id.* ¶ 41.) Plaintiff also asserts that by the time he spoke to Hardy in October 2012, he had lost his voice. (Drapes Aff. ¶ 3.) Since 2012, despite the many surgeries, Drapes' condition remains "[m]ostly . . . unchanged." (*Id.* ¶ 16.) He still suffers from laryngitis, and avers that "none of [his] treatment has restored [his] voice or stopped the pain." (*Id.* ¶ 9.) To this day, the more Drapes talks, the more it hurts. (*Id.* ¶ 17.) Drapes believes that "the constant delays in treatment [have] permanently harmed [his] throat. (*Id.* ¶ 9.) He contends that no medical professional has been able to provide him with a "firm diagnosis" to date. (*Id.* ¶ 17.)

## II. Procedural History

Drapes initiated this lawsuit on December 5, 2014. (Complaint [1].) The court appointed *pro bono* counsel who, on August 12, 2015, filed an Amended Complaint on Drapes' behalf. (December 19, 2015 Order [5]; First Amended Complaint [20].) Drapes named five defendants: Hardy, three individuals who subsequently served as wardens at Stateville, and an unidentified individual "responsible for screening sick call requests." (First Amended Complaint ¶¶ 2-7.) As amended, the Complaint alleges that Defendants were deliberately indifferent to Drapes' medical needs in violation of the Eighth and Fourteenth Amendments to the United States Constitution. (*Id.* ¶ 1.)

Defendants moved to dismiss under Federal Rule of Civil Procedure 12(b)(6). (First Motion to Dismiss [28].) The court struck this motion in view of Plaintiff's counsel's stated intention to file a second amended complaint. (*See* Minute Entry of July 13, 2016 [46].) Subsequently, Plaintiff's counsel moved for relief from assignment under Federal Rule of Civil Procedure 11, citing an inability to file an amended complaint in accordance with their ethical obligations. (Motion to Withdraw [84].) The court granted this motion. (Minute Entry of October 5, 2017 [87].) Proceeding pro se, Drapes elected not to draft a second amended complaint, and the defendants renewed their motion to dismiss. (Opinion of January 16, 2018 [98] at 3.) On January 16, 2018, the court issued an order granting this motion as to all Defendants other than Hardy. (*Id.* at 7.)

The parties proceeded with brief discovery. On August 17, 2018, Hardy moved for summary judgment. (Def.'s MSJ [116-1].)

**<u>DISCUSSION</u>**

The court will grant summary judgment if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Hanover Ins. Co. v. Northern Bldg. Co.*, 751 F.3d 788, 791 (7th Cir. 2014). In determining whether factual issues exist, the court views all the evidence and draws all reasonable inferences in the light most favorable to the non-moving party. *Weber v. Univ. Research Assoc., Inc.*, 621 F.3d 589, 592 (7th Cir. 2010). The court does not "judge the credibility of the witnesses, evaluate the weight of the evidence, or determine the truth of the matter. The only question is whether there is a genuine issue of fact." *Gonzalez v. City of Elgin*, 578 F.3d 526, 529 (7th Cir. 2009) (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 249-50 (1986)). "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." *Johnson v. Manitowoc Cty.*, 635 F.3d 331, 334 (7th Cir. 2011) (quoting *Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 640-41 (7th Cir. 2008)). To survive summary judgment on a deliberate indifference claim based on a delay in medical care, in particular, the plaintiff must produce sufficient evidence

for a jury to conclude that the defendant was aware of the plaintiff's condition, and knew that the care being provided was insufficient. *See Petties v. Carter*, 836 F.3d 722, 726 (7th Cir. 2016), *as amended* (Aug. 25, 2016); *Conley v. Birch*, 796 F.3d 742, 747 (7th Cir. 2015).

In its prohibition of "cruel and unusual punishments," the Eighth Amendment imposes a duty upon prison officials to provide "humane conditions of confinement." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). Included in this duty is an obligation to "ensure that inmates receive adequate food, clothing, shelter, protection, and medical care." *Henderson v. Sheahan*, 196 F.3d 839, 844 (7th Cir. 1999) (quoting *Oliver v. Deen*, 77 F.3d 156, 159 (7th Cir. 1996). With regard to medical care, a prison official fails to meet her constitutional obligation if she acts "with deliberate indifference to the serious medical needs of an inmate." *Holloway v. Delaware Cty. Sheriff*, 700 F.3d 1063, 1072 (7th Cir. 2012).

To succeed on a deliberate indifference claim involving a delay in medical treatment, a plaintiff must demonstrate two elements: (1) "an objectively serious medical condition," and (2) "an official's deliberate indifference to that condition." *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011). For purposes of this motion, Hardy does not contest the first element, conceding that Drapes "suffered from a serious medical need from June through December, 2012". (Def.'s MSJ [116-1] at 4.) Hardy instead moves for summary judgment on sole the basis that, he contends, the record cannot substantiate that he was deliberately indifferent to that need.

The Supreme Court characterizes deliberate indifference as "lying somewhere between the poles of negligence at one end and purpose or knowledge at the other." *Farmer*, 511 U.S. at 836. It is an inherently subjective element, requiring proof that an official was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," and proof that the official "also [drew] that inference." *Id*. Where, as here, a plaintiff claims an unconstitutional delay in medical treatment, "nonmedical officers may be found deliberately indifferent if they have a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner." *McGee v. Adams*, 721 F.3d 474, 483 (7th Cir. 2013) (quoting *King v.*

*Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012)). A supervisory official who learns of a constitutional violation by way of a grievance, for example, may exhibit deliberate indifference by ignoring that grievance. *See Santiago v. Walls*, 599 F.3d 749, 758-59 (7th Cir. 2010). Additionally, a plaintiff attempting to prove deliberate indifference in the form of a delay in medical treatment must introduce "verifying medical evidence that shows his condition worsened because of the delay." *Knight v. Wiseman*, 590 F.3d 458, 466 (7th Cir. 2009).

There is a triable issue of fact as to whether Hardy was aware that Drapes faced a substantial risk of serious harm. Drapes testified that, in September, he personally informed Hardy of his medical issues and relayed his inability to obtain treatment. Drapes' October 1 letter corroborates that this conversation took place. Although Drapes does not recall precisely which details he relayed to Hardy, his testimony permits reasonable inferences that he told Hardy, among other things, (1) that Drapes had been diagnosed to have a pre-cancerous growth on his vocal cords, (2) that Drapes had been unable to obtain any treatment whatsoever for that condition in his three months at Stateville, and (3) that as Drapes waited to be treated, he had lost his voice. A reasonable jury could find that these facts permit the inference that a substantial risk of serious harm existed, and therefore that Hardy was sufficiently on notice that Drapes was not being provided constitutionally adequate medical care.

Additionally, Hardy's purported response to Drapes suggests that Hardy drew the inference that Drapes was at risk. Drapes testified that after he informed Hardy of his persistent issues, Hardy responded that if Drapes wrote him a letter, Hardy would make sure Drapes was taken to the HCU. This suggests that, at very least, Hardy recognized the importance of Drapes being seen by a physician. Coupled with the information that Hardy allegedly already had on hand, his response would permit a jury to conclude that Hardy was deliberately indifferent by not only failing to follow up with Drapes, but indeed by actively insulating himself from being reached by Drapes.

Hardy's ostensible recognition that he was responsible for ensuring access to medical care is difficult to reconcile with his willingness to delegate both the reading of his personal mail and the review of grievances to subordinates with no apparent oversight. Contrary to Hardy's insistence that he escapes liability because "[t]o the extent appointments were missed or canceled and not rescheduled, the fault necessarily lies with the medical staff, and not Warden hardy," prison officials do not escape liability for constitutional violations simply by turning a blind eye to them.[3] *See Perez v. Fenoglio*, 792 F.3d 768, 781-82 (7th Cir. 2015). Hardy's habit of having subordinates sign his name to emergency grievances is not exculpatory in this regard. Courts in this district have emphasized in deliberate indifference cases that although the warden "may delegate [the responsibility to review inmate grievances] to others who sign his name for him, the buck still stops at the warden." *Birch v. Jones*, No. 02 CV 2094, 2004 WL 2125416, at *7 (N.D. Ill. Sept. 22, 2004); *see also Goodman v. Carter*, No. 00 C 0948, 2001 WL 755137, at *5 (N.D. Ill. Jul. 2, 2001) (holding that a warden "may not play a 'shell game,' delegating responsibility without disclosing to whom it is delegated, then denying personal responsibility when a prisoner seeks to hold him accountable").

The court concludes, however, that Defendant is entitled to summary judgment on his claim that the delay in treatment violated the Constitution. Drapes's condition was diagnosed and treated before he arrived at Stateville in 2012. Since early in 2013, he has received further surgery and other treatment for his condition, and there is no medical evidence tying the delay at issue in this case to the harm he suffered. The Seventh Circuit has held that for a plaintiff to succeed on an Eighth Amendment deliberate indifference claim based on a delay in medical treatment, there must be "verifying medical evidence that shows [the plaintiff's] condition worsened because of the

---

[3] Drapes additionally cites *Glison v. Indiana Dept. Corrections*, in which the Seventh Circuit noted that "if institutional policies are themselves deliberately indifferent to the quality of care provided, institutional liability is possible." 849 F.3d 372, 378 (7th Cir. 2017). As Drapes has not named an institutions as a defendant, however, *Glison* is not relevant.

delay." *Knight v. Wiseman*, 590 F.3d 458, 466 (7th Cir. 2009). See also *Williams v. Liefer*, 491 F.3d 710, 715 (7th Cir. 2007) ("evidence of a plaintiff's diagnosis and treatment, standing alone, is insufficient if it does not assist the jury in determining whether a delay exacerbated the plaintiff's condition or otherwise harmed him"). There is no such evidence in the record. Drapes, who remains incarcerated and is proceeding pro se, acknowledges that no doctor has told him that the delay in treatment exacerbated his throat condition. (Def.'s 56.1 ¶ 42; Pl.'s Resp. Def.'s 56.1 ¶ 42.)

Drapes cites *Berry v. Peterman*, in which a prisoner suffered from tooth decay and serious pain that prison officials and medical staff allegedly ignored for two months. 604 F.3d 435, 440 (7th Cir. 2010). Plaintiff in that case, proceeding pro se, filed numerous complaints about his "steadily-worsening" pain, and the court noted that "medical records indicate[d] that the delay unreasonably prolonged Berry's suffering." *Id.* at 438, 442. In the case before this court, medical notes show that Drapes complained of "chronic laryngitis" in June 2012 and of "hoarseness" in August 2012. (Medical Records, Ex. D to Def.'s 56.1 [116-5].) The only reference to pain in the notes relates to a shoulder injury Drapes had reportedly suffered at Cook County jail. (*Id.*) In short, no medical record or expert report shows that Drapes, who had undergone surgery earlier for his throat condition, was suffering from severe or worsening pain during the last months of 2012. Indeed, at his deposition, Drapes characterized his throat condition during the period from June through December 2012 as "slight pain and soreness" that did not interfere with eating or with recreation. (Drapes Dep., Ex. C to Def.'s 56.1 [116-4] at 51.)

Recognizing the difficulties that a prisoner faces in mounting a "deliberate indifference" claim, this court recruited counsel to represent Drapes [5]. Counsel prepared an amended complaint [20] and obtained and reviewed medical records [66]. The attorney ultimately concluded, however, that he could not take further action consistent with Rule 11 and withdrew without providing medical evidence in support of Drapes's belief that the delay worsened his condition. Without such verifying medical evidence, Drapes cannot establish that the delay for

which he faults Warden Hardy worsened his pain or exacerbated his throat condition. Hardy is entitled to summary judgment.

Final judgment will be entered in this case. If Drapes wishes to appeal, he must file a notice of appeal with the Clerk of Court within thirty days of the entry of judgment. *See* FED. R. APP. P. 4(a)(1). If Plaintiff appeals, he will be liable for the $505.00 appellate filing fee regardless of the appeal's outcome. *See Evans v. Ill. Dep't of Corr.*, 150 F.3d 810, 812 (7th Cir. 1998); *Bentz v. Palmer*, No. 12 CV 1753, 2015 WL 1042932, at *5 (N.D. Ill. Mar. 5, 2015). If the appeal is found to be non-meritorious, Plaintiff could be assessed a "strike" under 28 U.S.C. § 1915(g). If a prisoner accumulates three "strikes" because three federal cases or appeals have been dismissed as frivolous or malicious, or for failure to state a claim, the prisoner may not file suit in federal court without pre-paying the filing fee unless he or she is in imminent danger of serious physical injury. *Id.* If Plaintiff seeks leave to proceed *in forma pauperis* on appeal, he must file a motion for leave to proceed *in forma pauperis* in this court. *See* FED. R. APP. P. 24(a)(1).

Plaintiff need not bring a motion to reconsider this court's ruling to preserve his appellate rights. If he does seek reconsideration, he may file a motion under FED. R. CIV. P. 59(e) or 60(b). Any Rule 59(e) motion must be filed within 28 days of the entry of this judgment. *See* FED. R. CIV. P. 59(e). The time to file a motion pursuant to Rule 59(e) cannot be extended. *See* FED. R. CIV. P. 6(b)(2). A timely Rule 59(e) motion suspends the deadline for filing an appeal until the Rule 59(e) motion is ruled upon. *See* FED. R. APP. P. 4(a)(4)(A)(iv). Any Rule 60(b) motion must be filed within a reasonable time and, if seeking relief under Rule 60(b)(1), (2), or (3), must be filed no more than one year after entry of the judgment or order. *See* FED. R. CIV. P. 60(c)(1). The time to file a Rule 60(b) motion cannot be extended. *See* FED. R. CIV. P. 6(b)(2). A Rule 60(b) motion suspends the deadline for filing an appeal until the Rule 60(b) motion is ruled upon only if the motion is filed within 28 days of the entry of judgment. *See* FED. R. APP. P. 4(a)(4)(A)(vi).

## **CONCLUSION**

For the foregoing reasons, Defendant's motion for summary judgment [116] is granted. Plaintiff's related motion to appoint counsel for trial is denied as moot. As this Order disposes of Plaintiff's claims against the sole remaining Defendant in this matter, the court instructs the Clerk to enter final judgment pursuant to FED. R. CIV. P. 56(a). The case is terminated.

ENTER:

Dated: March 29, 2019

_____
REBECCA R. PALLMEYER
United States District Judge